21-487
In re: Citibank August 11, 2020

Park, *Circuit Judge*, concurring in the judgment (amended):

When people receive money by mistake, the law usually requires them to give it back. This commonsense rule allows transferors to reclaim property that rightfully belongs to them—whether misdirected funds,[1] an accidental overpayment,[2] or a credit to the wrong bank account.[3] An exception to the general rule can sometimes protect a recipient who was owed the mistakenly paid money. Under this narrow equitable defense, called "discharge for value," a creditor who receives a payment in discharge of a debt he is owed can defeat restitution by invoking his own competing claim to the disputed funds. But here, Defendants had no such claim—not when they received Citibank's money, and not when they were asked to give it back—because they were not entitled to payment for another three years after Citibank erroneously sent them half a billion dollars. Allowing them to keep that money would turn equity on its head and topple the settled expectations of participants in the multitrillion-dollar corporate-debt market. It would also be brutally unfair.

---

[1] *E.g.*, *Home Sav. Bank v. Rolando*, 14 A.2d 822, 824 (R.I. 1940) (sum of money paid by a bank to the executor of the late Francisco Marsicano was erroneously drawn from an account that "in fact . . . belonged to another man by the name of Francisco Marsicano").

[2] *E.g.*, *PaineWebber, Inc. v. Levy*, 680 A.2d 798, 798–800 (N.J. Super. Ct. Law Div. 1995) (seller of stock received proceeds for 100 times his number of shares due to an unprocessed reverse stock split).

[3] *E.g.*, *Citibank, N.A. v. Warner*, 449 N.Y.S.2d 822, 823 (Sup. Ct. 1981) ("[T]he bank inadvertently microencoded the defendant's account number 010 22666 thereon, instead of the account number of the [intended recipient] 109 22666.").

In my view, this is a straightforward case that many smart people have grossly overcomplicated. The Court ultimately arrives at the correct conclusion but only after taking an unnecessary detour through the factual record. I agree with the majority that the district court clearly erred in concluding that there were insufficient red flags to put Defendants on notice of Citibank's mistake. I also agree that the district court erred as a matter of law in its overreading of *Banque Worms*. But Defendants' case fails on a more basic level: A recipient of mistakenly transferred funds cannot invoke the discharge-for-value defense—a general legal rule incorporated by the *Restatement (First) of Restitution* and the New York Court of Appeals—unless and until it has a present entitlement against the debtor. Put simply, you don't get to keep money sent to you by mistake unless you're entitled to it anyway. I respectfully concur only in the judgment.

## I. BACKGROUND

On August 11, 2020, Citibank set out to process a $7.8 million interest payment to the lenders of its client Revlon, Inc., a global cosmetics company. But instead, Citibank inadvertently wired the entire principal balance of the loan—nearly $1 billion—from the bank's own account. Some recipients gave the funds back. Defendants ("the Creditors"), managers who controlled over $500 million of the mistakenly transferred funds, did not. Citibank sued, lost at a bench trial, and appealed to this Court.

A. Revlon's Debt Dispute

In 2016, Revlon took out a $1.8 billion loan (the "2016 Term Loan") to finance its purchase of Elizabeth Arden, Inc., another cosmetics brand. A syndicate of lenders agreed (under the "2016 Term Loan Agreement") to provide the funds in exchange for

2

periodic interest payments and a return of principal on September 7, 2023, the maturity date. Revlon offered certain intellectual property ("IP") as collateral.

In addition to Revlon and the lenders, Citibank was party to the contract as the "Administrative Agent and Collateral Agent." In that role, Citibank was charged with receiving interest and principal payments from Revlon and passing them along to the lenders. Those lenders—investors and investment vehicles that took a variety of corporate forms—were represented by portfolio managers, including Defendants, who controlled the lenders' funds.

By spring 2020, liquidity had become tight for Revlon in the face of slumping sales numbers and the beginning of the COVID-19 pandemic. Revlon tried to raise additional capital to meet its immediate financial obligations, and it again sought to put up its IP as collateral. But to do so, it had to win majority approval of the 2016 Term Loan lenders, whose loans were secured by the same property. So Revlon proposed a "roll-up" transaction: A lender who agreed to the refinancing would convert its 2016 Term Loan position into a new one in the 2020 loan. The consenting creditors would thus continue to have their loans secured by Revlon's IP, while those maintaining their 2016 positions would effectively lose their priority.

Not all agreed. The objecting lenders—Defendants here among them—campaigned to block the deal, fearing that the restructuring would leave them holding the bag in the event of a default if others acceded to Revlon's plan and they did not. But ultimately, Revlon prevailed, and the IP transfer took place in May 2020. Afterwards, some objectors, including Defendants, accused Revlon of manipulating the vote. In an effort to accelerate the debt's

maturity and to demand repayment immediately, they planned a lawsuit in which they would allege that Revlon was "deeply insolvent." Joint App'x at 177. By then, the value of the 2016 Term Loan had fallen to roughly 25 to 30 cents on the dollar. The Creditors' lawsuit, naming Revlon and Citibank as defendants, was eventually filed on August 12, 2020, at 2:06pm.

B.    The Mistake

Just one day before then, however, the Creditors were suddenly repaid in full. Notwithstanding Revlon's dire financial straits, its reputation for playing leveraged-finance hardball,[4] and the impending lawsuit alleging its chronic insolvency, each creditor on the 2016 Term Loan received, without notice or explanation, every penny of its principal and interest balance three years early, for a total of $893,944,008.52 in prepaid principal.

Of course, Revlon had *not* suddenly acquired the cash, or the irrational impulse, to prepay all of its outstanding debt to the 2016 creditors at four times its market value. Instead, Citibank had paid off the balances by mistake.

That day, August 11, 2020, Citibank was tasked with executing a roll-up for a few of the 2016 lenders. This required Citibank (1) to pay accrued interest to those lenders, and (2) to move their principal balance to a new loan facility. Under the constraints of Citibank's "Flexcube" payments software, the best way to do that was

---

[4] Revlon was at the time 85% owned by Ronald Perelman's MacAndrews & Forbes Inc., whose own battle to take over Revlon is one of the most famous corporate-control fights in modern history. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

apparently to pay *all* of the 2016 lenders their accrued interest.   Then, Citibank would synthetically pay all those lenders their principal by routing it into a "wash account," from which the principal could be reallocated into the old and new tranches of loans.

Revlon agreed to pay accrued interest to all of the 2016 lenders in this way, and Citibank delegated execution to an employee at its contractor in India.   In order to pay out interest but redirect the principal into a wash account, that employee had to check three cryptically named boxes in Flexcube: "FRONT," "FUND," and "PRINCIPAL."   But the employee checked only "PRINCIPAL," and neither of the two supervisors charged with verifying the transaction spotted the error.   So, instead of booking a wash transfer, Flexcube *actually* wired nearly $1 billion of Citibank's own money out the door to the 2016 Term Lenders.

The lenders each received a "Calculation Statement" showing only a payoff of accrued interest.   The dollar amounts they were wired, however, were over 100 times larger.   Per the 2016 Term Loan Agreement, Revlon was permitted to prepay the loan, but it had to give notice to Citibank three days in advance, and Citibank then had to notify the lenders of the decision "promptly."   No lender received notice that Revlon was prepaying any debt.

C.      The Aftermath

The day after the transfer, on August 12, at around 2:25pm, Citibank began sending "Recall Notices" to the lenders notifying them of the mistake.   Managers controlling about half of the total sum quickly agreed to return the mistakenly wired funds. Defendants decided not to do so.

First came mockery.   From one pair of employees:

[Employee A]:     I feel really bad for the person that fat fingered a $900mm erroneous payment.   Not a great career move

. . . .

[Employee B]:     certainly looks like they'll be looking for new people for their Ops group

[Employee A]:     How was work today honey?   It was ok, except I accidentally sent $900mm out to people who weren't supposed to have it

[Employee A]:     Downside of work from home. maybe the dog hit the keyboard

[Employee B]:     the song "Had a Bad Day" playing in the background

Spec. App'x at 73.

Then came strategy.   After receiving the Recall Notices, the Creditors paused.   There were calls and emails with counsel.   There were sudden reversals, instructions to stop payment.   *See, e.g.*, Joint App'x at 1302–03 ("Sounds like we have a good bargaining chip with Citi/revlon"; "Do not refund [the payment], I am on a call with attorneys right now.").   And then, a few months later, there was voluntary dismissal of the Creditors' earlier lawsuit against Revlon. After all, the Creditors already had more than what they wanted: They could, as one employee put it, "take the money and run."   *Id.* at 1295.

6

Less than a week after the error, on August 17, 2020, Citibank sued under theories of unjust enrichment, conversion, money had and received, and payment by mistake. Citibank sought equitable relief in the form of specific restitution of its identifiable funds.[5] The United States District Court for the Southern District of New York granted a temporary restraining order freezing the funds,[6] but after a bench trial, the district court entered judgment for Defendants and held that recovery was barred by the discharge-for-value defense. *In re Citibank Aug. 11, 2020 Wire Transfers*, 520 F. Supp. 3d 390 (S.D.N.Y. 2021). Citibank appealed, arguing the defense does not apply for three reasons: (1) Defendants were not yet entitled to payment, (2) Defendants did not apply the funds to credit Revlon's account before receiving the Recall Notices, and (3) Defendants were on constructive notice of the mistake even before those Recall Notices were issued.

## II. MERITS

Mistaken payments generally must be returned to the payor. *See Ball v. Shepard*, 95 N.E. 719, 721 (N.Y. 1911); *Moses v. Macferlan* (1760) 97 Eng. Rep. 676, 680-81; 2 Burr. 1005, 1012 ("This kind of equitable action, to recover back money, which ought not in justice to

---

[5] Remedies for unjust enrichment are available both at law (typically money damages) and at equity (typically specific enforcement of a constructive trust). *See* Restatement (First) of Restitution § 160 cmt. e. Citibank justifies its request for equitable relief in part based on the organizational structure of the lenders and managers, which Citibank says would make it difficult to trace and collect an unsecured money judgment. *Cf.* John Morley, *The Separation of Funds and Managers: A Theory of Investment Fund Structure and Regulation*, 123 Yale L.J. 1228, 1240–41 (2014).

[6] The funds remained frozen pending our review and continue to be frozen under the injunction this Court enters today.

7

be kept . . . lies for money paid by mistake."). The logic of this rule, a fundamental part of the law of unjust enrichment, is obvious: People do not lose all rights to their property merely because they mistakenly gave possession of it to someone else.[7]

Citibank erroneously sent a billion dollars from its own account to the creditors of Revlon three years before they were entitled to payment. Citibank thus has an unquestionable claim to entitlement under the law of unjust enrichment. *See* 3 George E. Palmer, *Law of Restitution* § 14.1(a), at 173 (3d ed. 2020) ("[U]njust enrichment in one of its clearest forms" exists when "because of plaintiff's mistake, the defendant received a money payment to which he was not entitled, and his claim for its retention rests primarily on the fact that he has it, or at least that he received it from the plaintiff."). Defendants argue that they are nevertheless entitled to keep the funds erroneously transferred by Citibank based on the discharge-for-value defense, as recognized by section 14 of the *Restatement (First) of Restitution*. *See Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 198 (N.Y. 1991). They clearly are not.

The majority correctly vacates the judgment of the district court but only after conducting a detailed survey of the record and New York caselaw on discharge for value. I do not disagree with that

---

[7] For the preservation of property rights, see Restatement (First) of Restitution § 163 ("Where the owner of property transfers it as a result of a mistake of such a character that he is entitled to restitution, the transferee holds the property upon a constructive trust for him."). *Accord* Restatement (Third) of Restitution § 1 cmt. b (explaining that transactions that result in "[u]njustified enrichment . . . [are] ineffective to work a conclusive alteration in ownership rights.").

analysis but would have reached the same result more directly by applying basic principles of unjust enrichment as explained below.

A.    Background Principles

The majority opinion might leave the impression that the discharge-for-value defense was first conceived of by the American Law Institute in the 1930s and then brought into existence by the New York Court of Appeals in 1991.   The majority treats the discharge-for-value rule as an espousal of "New York's general rule that mistaken payments should be returned."   Maj. Op. at 94.   But in fact, the discharge-for-value defense, as defined by the *Restatement* and then recognized in *Banque Worms*, is merely a "specific application" of a traditional equitable defense: "the principle of bona fide purchase."   Restatement (First) of Restitution § 14 cmt. a.

1.    *Bona Fide Purchase*

The bona fide purchase defense protects a party who "innocently has acquired the title to something for which he has paid value."   *Id.* § 13 cmt. a.   "Without notice of the circumstances" that would have given rise to a restitution claim against the seller, such a purchaser is insulated from restitution claims arising out of property purchased for value in good faith.   *Id.* § 13(a) (cleaned up).   That is, if *B* would owe *A* restitution over *X*, but *C*, without notice, gives value to *B* in exchange for legal title to *X*, then *A* cannot claim restitution from *C*.   The buyer *C* is "protected, as well at law, as in equity, in [his] purchase[] . . . since it would be impossible for him to guard himself against such latent frauds."   1 Joseph Story, *Commentaries on Equity Jurisprudence* § 381, at 373 (1836); *see also Simpson v. Del Hoyo*, 94 N.Y. 189, 193–94 (1883); 3 John Norton Pomeroy, *Equity Jurisprudence* § 738, at 8 (5th ed. 1941) ("[E]quity refuses to interfere

9

and to aid the plaintiff in what he is seeking to obtain, because it would be unconscientious and inequitable to do so.").

Importantly, the bona fide purchase rule is distinct from the alternative defense of mistake of fact or detrimental reliance. That defense may "terminate[] or diminish[]" the "right of a person to restitution from another because of a benefit received because of mistake" through a "[c]hange of circumstances." Restatement (First) of Restitution § 69(1)–(2). That is, if a recipient reasonably relies on a mistaken transfer to his detriment, he may be able to block recovery to the extent of his justified reliance. But the good-faith purchaser need not show any special change in circumstances. He has done more than merely detrimentally *rely* on a mistake; he has given *value* for a property interest, which protects the buyer not only in his reliance, but in his justified expectations, and so fully insulates him from any restitution claims that were viable against the seller. *See* Henry E. Smith, *Equity as Meta-Law*, 130 Yale L.J. 1050, 1095 (2021) (explaining that giving value is said to make the bona fide purchaser "equity's darling" but that "lack of value given means no reliance (or change of position)").

2.   *Discharge for Value*

Discharge for value is a "specific application" of the bona fide purchase rule. Restatement (First) of Restitution § 14 cmt. a. But a discharge-for-value creditor is both the purchaser *and* the party who would otherwise owe restitution, rather than a third party buying from one who owed restitution to another.

The defense works like this: A creditor has a claim against a debtor for unpaid debt, and a third party mistakenly sends money to the creditor on behalf of the debtor. For example, the third party

10

might mistakenly believe it is under a duty to do so,[8] or it might simply have made a clerical error.[9]    As a result, the sender may have an unjust-enrichment claim against the creditor.    *See supra* at 7-10.[10] And if that were the end of the matter, the creditor would not be able to defeat this claim through the defense of bona fide purchase because he is the original recipient, not a subsequent purchaser.    *See* 3 Palmer § 16.6(b), at 590 ("When relief depends merely upon a setting aside of the payment itself, or upon rescinding an agreement pursuant to which the payment was made, the usual rules governing restitution will apply.").

The way to square bona fide purchase with discharge for value is the right of setoff.    "The right of setoff . . . allows entities that owe

---

[8] *E.g.,* Restatement (First) of Restitution § 14 illus. 5 ("A, under the erroneous belief that he has effectively promised B to pay C's debt to him, makes payment thereof to B.    He is not entitled to restitution from B."). Judge Leval offers a discussion about the nature of mistake under the discharge-for-value defense.    *See* "Addendum" (Leval, *J.*) at 95-99.    I am doubtful that the inquiry he proposes, which would seem to turn on the mental states of people making accidental payments, would be as straightforward as he believes.    But in any event, as Judge Leval acknowledges, "[r]esolution of this question is of course unnecessary to deciding this case."    *Id.* at 99.

[9] *E.g., Banque Worms v. BankAmerica Int'l,* 570 N.E.2d 189 (N.Y. 1991).

[10] Much of this analysis would apply if the debtor (rather than a third party) were to erroneously pay the creditor directly.    But in such a case, there would likely be no unjust enrichment as between the two parties: If the debtor pays a creditor a debt that is due, then the debtor is out what he owes, and the creditor receives only what she is due.    *See* 3 Palmer § 14.1(a), at 173 & n.20.    The *Restatement*'s discharge-for-value rule, which concerns claims between a mistaken third-party payor and a creditor, presumes the prima facie availability of an unjust-enrichment claim.

11

each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)); *see Off. Comm. of Unsecured Creditors v. Mfrs. & Traders Tr. Co.* (*In re Bennett Funding Grp., Inc.*), 146 F.3d 136, 138–39 (2d Cir. 1998) (New York law). Thus, a creditor—usually a bank—in possession of funds in the account of the debtor may apply (or "set off") the debtor's funds against a claim for unpaid debt. *See, e.g.*, *Marine Midland Bank-N.Y. v. Graybar Elec. Co.*, 363 N.E.2d 1139, 1142–43 (N.Y. 1977). In the case of discharge for value, a creditor sets off funds that were sent by a third party for the account of the debtor and on the debtor's behalf. *See* Brief for Amicus Curiae Loan Syndications and Trading Association in Support of Plaintiff-Appellant and Reversal at 11–12 (highlighting the parallel between setoff and discharge for value); *cf. In re Awal Bank, BSC*, 455 B.R. 73, 93 (Bankr. S.D.N.Y. 2011) (sustaining a claim over the discharge-for-value defense because plaintiff plausibly alleged notice before setoff).

Through setoff, the creditor gives value by applying mistakenly transferred funds to discharge an unpaid debt, thus taking title to the funds in exchange for surrendering a valuable claim against the debtor. Once that happens, "it would be inequitable to require restitution from the transferee since, in the surrender of the debt . . . he has given value and acquired title to the money or other thing given in payment." Restatement (First) of Restitution § 14 cmt. b; *see also id.* § 13 cmt. a ("The principle that a person who innocently has acquired the title to something for which he has paid value is under no duty to restore it to one who would be entitled to reclaim it if the one receiving it had not been innocent or had not obtained the

12

title or had not paid value therefor . . . [is] [t]he same underlying principle [operating] under the circumstances stated in § 14."); Restatement (Third) of Restitution and Unjust Enrichment § 67 cmt. a ("The thought behind the expression 'discharge for value' is that the protected recipient of a payment is treated as a bona fide purchaser of the money, to the extent the payee gives value by accepting the payment in discharge of an antecedent debt.").[11]  In other words, whereas the mistaken payment standing alone was subject to restitution, setoff allows a creditor to assume the role of bona fide purchaser—by giving "value" (in the form of relinquishing its claim for debt) in exchange for funds received and applied in "discharge" (or satisfaction) of a debt.

In short, equity protects the secured expectations of creditors who have, without notice of a mistake, given value for the funds in their possession.[12]  As Section 14 of the *Restatement* states:

---

[11] The *Third Restatement* articulates a different defense called "bona fide payee," which is broader than the discharge-for-value defense. Restatement (Third) of Restitution § 67; *see id.* § 67 cmt. a.  It is thus not dispositive of the scope of the discharge-for-value defense, *see infra* note 21, but its characterization of the traditional rule remains persuasive.

[12] One can question whether even this is enough to bring a creditor under the bona fide purchase rule.  In a typical bona fide purchase, a third-party purchaser gives value to a recipient of the property and is usually a stranger to the original owner.  Here, the creditor *is* the direct recipient and gives value to the original owner.  *See* Restatement (First) of Restitution § 13; *see also* 3 Palmer § 16.5, at 575 (further noting that, in other contexts, forgiveness of an antecedent debt may not be value); 3 Pomeroy § 748, at 26 (same).  Indeed, not all jurisdictions appear to accept the rule, instead allowing for restitution in cases where Section 14 would bar recovery.  *See Wilson v. Newman*, 617 N.W.2d 318, 321 (Mich. 2000).  But

13

A creditor of another or one having a lien on another's property who has received from a third person any benefit *in discharge of the debt* or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and *did not have notice of the transferor's mistake.*

Restatement (First) of Restitution § 14(1) (emphasis added).

B.    The Present-Entitlement Requirement

As a form of bona fide purchase, the discharge-for-value defense (1) requires a creditor to give "value" by setting off mistakenly transferred funds against a debt, and (2) rests on the premise that it would be inequitable to deprive a creditor of a payment he fairly bargained for.    Both these features of discharge for value lead to the same conclusion: Discharge for value requires a preexisting entitlement to mistakenly transferred funds.[13]    In *Banque Worms*, the New York Court of Appeals correctly described the *Restatement* rule it adopted when it said—without equivocation—that

in *Banque Worms*, the New York Court of Appeals held that New York follows the discharge-for-value rule, and no party has suggested that it no longer controls.

    [13] The majority opinion eventually reaches this conclusion in Section I.B.  *See* Maj. Op. at 82.   In my view, the Creditors' lack of entitlement to the principal balance of the loan on August 11, 2020 is a sufficient basis to reverse the district court.   Even so, I diverge from the majority's approach to the present-entitlement requirement.   The majority engages in a close reading of caselaw on present entitlement and balances various policy considerations.    But, as described here, the present-entitlement requirement is rooted in equity, not caselaw.

14

the defense protects only a creditor who is "entitled to the funds" he receives. 570 N.E. at 198.

### 1. *Discharge, Value, and Setoff*

Discharge for value requires giving value for mistakenly transferred funds in the form of relinquishing a debt. But here, the Creditors could not exercise setoff rights against Revlon's debt because that debt was not yet due.

"There is . . . no question that New York has long recognized a common law right of setoff." *In re Bennett Funding Grp.*, 146 F.3d at 139 (citing *Straus v. Tradesmen's Nat'l Bank*, 25 N.E. 372, 372 (N.Y. 1890)). And the first rule of common-law setoff is that, absent special circumstances,[14] a debt cannot be set off against unless the debt is "due and payable" because only then can it be "presently enforced." *De Camp v. Thomson*, 54 N.E. 11, 12 (N.Y. 1899). Thus, a creditor cannot unilaterally cleanse a payment of its mistaken character through setoff—and so take a transferor's money free of the payor's restitution claims—unless he has the power to apply the funds to satisfy a debt because that debt is already due.[15]

---

[14] *See* N.Y. Debt. & Cred. Law § 151; *Jordan v. Nat'l Shoe & Leather Bank of N.Y.*, 74 N.Y. 467, 473 (1878).

[15] Defendants argue that a creditor gives value immediately upon payment by the debtor, without any further action by the creditor. *See M'Crea v. Purmort*, 16 Wend. 460, 474 (N.Y. 1836) ("The payment of the money discharges or extinguishes the debt; a receipt for the payment does not pay the debt, it is only evidence that it has been paid."); *see also* 3 Palmer § 16.6, at 580 ("[R]eceipt of the plaintiff's funds in payment of . . . the debt of a third person is value."); *cf. Pittsburgh Nat'l Bank v. United States*, 657 F.2d 36, 38 (3d Cir. 1981) (Under Pennsylvania law, "as soon as a debt owed to a

For a matured debt, discharge for value tracks ordinary setoff principles. If the mistakenly transferred funds were already in the creditor's possession in the account of the debtor, the creditor would be entitled simply to collect. But the "self-help remedy in the form of a setoff[] cannot be exercised until . . . the obligation is due an[d] payable." *Marine Midland Bank-N.Y.*, 363 N.E.2d at 1143. That maturity condition is essential because without it, a pledge to offer credit for a defined term would be meaningless—a bank could, for example, seize a customer's deposits to offset them against her new 30-year home mortgage loan. So when a creditor holds an *unmatured* debt, it cannot apply the debtor's funds to satisfy an unripe claim, even if those funds are already legitimately and unmistakenly in the creditor's possession. It would make no sense for a creditor

bank by a depositor matures, the bank's right of setoff extinguishes the depositor's rights in the account."). Citibank contends that giving value within the scope of the defense instead requires the creditor affirmatively to set off the debt by crediting the debtor's account. *See NBase Commc'ns, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 8 F. Supp. 2d 1071, 1077 (N.D. Ill. 1998); *First Nat'l Bank & Tr. Co. v. Brant* (*In re Calumet Farm, Inc.*), 398 F.3d 555, 559–60 (6th Cir. 2005); *Qatar Nat'l Bank v. Winmar, Inc.*, 650 F. Supp. 2d 1, 10 (D.D.C. 2009) (mem.); *see also Equilease Corp. v. Hentz*, 634 F.2d 850, 853 (5th Cir. Jan. 1981) ("It is patently unfair to require an innocent payee who has received *and used* the money to satisfy a debt to repay the money." (emphasis added)); *cf. Strumpf*, 516 U.S. at 19 (noting the majority setoff rule requiring "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff" (citing *Baker v. Nat'l City Bank of Cleveland*, 511 F.2d 1016, 1018 (6th Cir. 1975))). We need not decide which rule applies. It does not matter whether the value in discharge for value is given by force of law upon receipt and maturity or via an affirmative action of the creditor because a creditor must at least be *capable* of setting off a debt (and thus giving value) using the funds that have mistakenly come into its possession. Before maturity, a creditor cannot do so and, in any event, has received a pure windfall.

16

suddenly to gain that right if, rather than holding the debtor's assets already, the creditor were instead to receive a payment made by mistake.   In other words, a creditor may not take a third party's money, even if sent in the name of the debtor, to cover a debt that *isn't yet due*, just because the creditor will become entitled to receive that money from the debtor in the future.

Although the right of setoff can be expanded by contract, the 2016 Term Loan Agreement here unsurprisingly preserved this basic constraint.   *See* Revlon, Inc., Annual Report (Form 10-K) exhibit 4.6 (Mar. 3, 2022) (2016 Term Loan Agreement § 10.7(b)) (allowing Revlon's lenders to "set off" funds "held or owing by such [l]ender . . . to or for the credit or the account of [Revlon]," but only "upon any amount becoming *due and payable*" by Revlon (emphasis added)).   Neither the general common-law right of setoff nor the specific contractual right here could be exercised because Revlon's debt was not due.

Without setoff, a creditor on an unmatured debt is not a "bona fide purchaser of the money."   Restatement (Third) of Restitution § 67 cmt. a (citing Restatement (First) of Restitution § 14)).   So the ordinary rule of restitution applies.

2.    *The Creditors' Windfall*

Defendants' argument also fails for a related, more basic reason: The Creditors received a massive windfall by being paid in full three years early.   As the majority recognizes, "[a]pplication of the discharge-for-value rule to our facts [would] bring[] the Lenders a huge windfall over and above what they bargained for."   Maj. Op. at 90.   The bona fide purchaser is protected because it would be unjust and inequitable to claw back property from one who

17

innocently gave value for it. The defense does not apply to a recipient who received a pure windfall—for example, a donee who received the subject property for free. *See Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978); *Oliver v. Piatt*, 44 U.S. 333, 401 (1845) (Story, *J.*) (emphasizing the "full right to follow such property into the hands of such third person, unless he stands in the predicament of a *bona fide* purchaser, for a valuable consideration, without notice"); J.B. Ames, *Purchase for Value Without Notice*, 1 Harv. L. Rev. 1, 3 (1887) ("If he gave no value, though his acquisition was honest, his retention of the title, after knowledge of the equity, is plainly dishonest."); *see also* Restatement (First) of Restitution § 13 cmt. a (noting that Section 14 "merely creates convenient rules for determining which of two *innocent persons should bear a loss*" (emphasis added)). Without entitlement, there would be no injustice in allowing recovery, and the discharge-for-value defense does not apply.

At a minimum, a creditor invoking the defense must have received only what he was owed. But the Creditors here received an unearned gain—and will have suffered no loss after restitution—because they were not yet entitled to be paid. To be sure, the Term Loan Agreement provided for the possibility of prepayment, but only if Revlon chose to do so. *See* Joint App'x at 1263 (2016 Term Loan Agreement § 2.11(a)) ("[Revlon] *may* at any time and from time to time prepay," under certain conditions, any tranche of its loans. (emphasis added)). By definition, prepayment is an option of the debtor, not a right of the creditor. *See Prepayment Clause*, Black's Law Dictionary (11th ed. 2019) ("A loan-document provision that *permits* a borrower to satisfy a debt before its due date." (emphasis added)).

The Creditors could not demand payment until 2023, and they were not entitled to their principal until then.[16]

It does not matter, as the Creditors suggest, that they were entitled to be paid eventually. A dollar today is not equal to a dollar tomorrow. *See generally* Irving Fisher, *The Theory of Interest* (1930). That is why debt contracts include detailed terms about the timing of payments, and why repayment timing invariably affects other elements of the bargain including the amount of interest, covenants made by the debtor, and the like. The Creditors' argument—that there is no "time" in "entitlement"—defies the basic premise of debt contracts, whose function is to exchange the time value of money: A debtor becomes entitled to cash now; a creditor, to money plus interest on a future date.

The windfall the Creditors received here is hard to overstate. On August 11, 2020, the Creditors were entitled to *nothing*. Moreover, they had just lost a bitter dispute with Revlon, held loans that were trading for a fraction of their face value, and were on the verge of filing a suit alleging a default.[17] Then, out of the blue, they

---

[16] If Revlon had decided to prepay its debt in full, and if Citibank had provided the contractually required prepayment notice, then the debt would have become "due and payable on the date specified therein." *See* Joint App'x at 1263 (2016 Term Loan Agreement § 2.11(a)); *cf. Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497 (D.C. 1985) (granting discharge for value based on the equitable right to receive discretionary transfer once that discretion is exercised). But absent such notice of prepayment, the status quo remained unchanged and the debt was not due for three years.

[17] The Creditors briefly suggest that they *were* in fact entitled to the transferred funds by reason of Revlon's default. Specifically, they say that a notice of default issued on August 12, 2020 (the day after the mistaken

19

received half a billion dollars in cash—a pure bank error in their favor.[18]   Discharge for value protects only parties who received what they bargained for.   That does not include the Creditors here.

### 3.    Banque Worms

In *Banque Worms v. BankAmerica International*, 928 F.2d 538 (2d Cir. 1991), we asked the New York Court of Appeals whether it follows the *Restatement*'s discharge-for-value rule.   *Id*. at 539.   The court answered that it does, and both its conclusion and its articulation of the rule were consistent with the *Restatement*—including its implied present-entitlement requirement.   *Id.*   The majority agrees that the present-entitlement requirement is "clear" in *Banque Worms* and every precedent relied on therein (a reflection of long-established principles of equity).

In *Banque Worms*, Spedley Securities (the debtor) had maintained a revolving credit agreement with Banque Worms (the

transfer, but—apparently purely by coincidence—just before the Recall Notices were sent) accelerated the debt and made it then due and payable. That argument, which was asserted summarily, mentioned only in a footnote, and raised for the first time on appeal, is forfeited.   *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001) ("[W]e have repeatedly ruled that arguments presented to us only in a footnote are not entitled to appellate consideration."); *Greene v. United States*, 13 F.3d 577, 585–86 (2d Cir. 1994).

[18] Although I would not reach the issue, I agree with the majority that the Creditors were on inquiry notice.   *See supra* at 4–6.   But I am puzzled by the majority's extensive discussion about the correct notice standard, given that the Creditors (a) do not argue that anything other than constructive notice applies, and (b) do not cite any authority defining "constructive notice" under New York law as anything other than "inquiry notice."

creditor). Banque Worms decided not to renew the agreement and demanded payment of the outstanding debt on the due date, which was in ten days. *Id.* At 12:36 am on the due date, Spedley initially instructed Security Pacific (the agent) to send nearly $2 million to Banque Worms. But three hours later, Spedley revoked that instruction and told Security Pacific to pay a different creditor instead. *Id.* at 539–40. Security Pacific mistakenly executed both transfers that same day, leaving Spedley's account in overdraft and Security Pacific on the hook for the mistaken transfer to Banque Worms. Banque Worms refused to return the money, which reflected the sum that had become due just hours before the funds were transferred. Litigation ensued, with Banque Worms and Security Pacific both asserting claims to the funds. *Id.* at 540.

Citing Banque Worms's argument based in the bona fide purchase rule, the Court of Appeals answered that New York does indeed recognize the defense. The Court of Appeals explained that the defense "furthers the policy goal of finality in business transactions." *Banque Worms*, 570 N.E.2d at 196. After citing several early cases concerning title to money, the Court of Appeals noted that the rule was also consistent with the policy goals of the newly enacted Article 4-A of the New York Uniform Commercial Code. *Id.* at 195–97. Elaborating on the defense that it adopted, the court explained that "[w]hen a beneficiary receives money *to which it is entitled* and has no knowledge that the money was erroneously wired . . . such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation." *Id.* at 196 (emphasis added).

In line with the principles underlying the bona fide purchase rule, the Court of Appeals expressly held that Banque Worms was protected by the discharge-for-value rule because it was *"entitled to the funds"* it received. *Id.* at 198 (emphasis added); *see also* 82 N.Y. Jur. 2d Payment and Tender § 107 & n.4 (citing *Banque Worms* for the proposition that the discharge-for-value rule applies only for "a debt which is due"); *Credit Lyonnais N.Y. Branch v. Koval*, 745 So. 2d 837, 841 (Miss. 1999) (explaining, by reference to the "preeminent case on erroneous wire transfers" *Banque Worms*, that "the beneficiary receiving the funds transfer must be entitled to receive money in payment of a debt"); *A.I. Trade Fin., Inc. v. Petra Bank*, No. 89-cv-7987, 1997 WL 291841, at *4 (S.D.N.Y. June 2, 1997) (citing *Banque Worms* for the point that "[t]he discharge for value rule contemplates that at the time of the erroneous transfer the transferee/beneficiary have some present entitlement to the funds"); 3 Palmer § 16.6, at 580–82 ("In situations of endless variety, courts have denied restitution because money paid by one party was received in good faith by the other, *in satisfaction of . . . a valid claim* against a third person." (emphasis added)). The Creditors and the district court find ambiguity in *Banque Worms* where there is none.[19]

Of course, the facts of *Banque Worms* are very similar to those of this case. But there is one crucial difference: Unlike the Creditors here, Banque Worms was entitled to the money it mistakenly

---

[19] The majority implies that *Banque Worms* adds a present-entitlement requirement not otherwise included in Section 14. Maj. Op. at 91 ("[T]he district court is correct that Section 14 of the First Restatement does not mention a present entitlement requirement."). As Citibank correctly argues, *Banque Worms* explicitly states a requirement that the *Restatement* necessarily implies. *See* Appellant's Brief at 26.

received.   Indeed, it had just discontinued a revolving credit agreement and demanded payment, which was received on the very day it was due.   The payment thus arrived exactly as expected and exactly as owed.   *Banque Worms*, 928 F.2d at 539.   The Creditors here received the principal amounts of their loans, which were not due until 2023.   They clearly lacked entitlement under any definition of the term or reading of New York caselaw, as the majority observes. This lack of entitlement is dispositive—Banque Worms had a preexisting right to keep the money it received; the Creditors did not. That should be the end of the matter.

C.   The Creditors' View

The Creditors contend that a lender not yet owed back its money becomes entitled to be repaid early simply because a payment was made by mistake.   Under their theory, discharge for value would operate as a kind of legal alchemy, transforming far-away debt payments into cold hard cash.   The Creditors' view has no basis in law, equity, or common sense.

1.   *Textual Arguments*

Instead of addressing the legal content of the defense incorporated by the *Restatement* and then adopted in *Banque Worms*, the Creditors draw the wrong lessons from the text.   They say that Section 14 doesn't mention a present-entitlement requirement, only a "discharge" of the debt of a "creditor"; and that our Court, in interpreting the decision of the Court of Appeals in *Banque Worms*, found it important that Banque Worms was a "*bona fide* creditor." *Banque Worms*, 928 F.2d at 541.

These arguments are misguided. The "discharge" in discharge for value requires a discharge in exchange for *value*. *See supra* Section II.B.1. And in *Banque Worms*, our Court referred to Banque Worms as a *"bona fide* creditor" in passing only after explaining in detail the timeline of events and Banque Worms's entitlement to the funds. 928 F.2d at 539–40. More broadly, the Creditors' style of argument—relying on cherry-picked, isolated phrases taken out of context—is misplaced. "The language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (cleaned up) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). Neither the American Law Institute (in drafting the *Restatement*) nor the New York Court of Appeals (in deciding *Banque Worms*) acted as a legislature drawing up a new rule, requiring us to evaluate the meaning of statutory language. Rather, both relied on well-settled rules of law and equity, which we are bound to apply even if doing so may require more effort than reading legal text.

Here, Defendants' view—which effectively reads out "value" from "discharge for value"—is unfounded. Ordinarily, a recipient of mistakenly transferred funds must prove reasonable, detrimental reliance on the other party's mistake—and may keep transferred property only to the extent that recovery would be unjust. *See Banque Worms*, 570 N.E.2d at 192; Restatement (First) of Restitution § 69(1)–(2). Discharge for value, like the general defense of bona fide purchase, deems giving value as a substitute for a special showing of reliance. *See supra* Section II.A. There is thus an intuitive parallel between these two defenses: Mistake of fact requires detrimental reliance before a recipient is put on notice, and discharge for value similarly requires giving value before a recipient is put on notice.

The Creditors, like the district court, try to invert this principle by contending that because a discharge-for-value creditor need not show reliance, it *also* need not show value given. But bona fide purchase excuses a separate showing of reliance *because* the purchaser has given value. Simply being a creditor entitled to payment sometime in the future, without reliance or value, is irrelevant.[20]

## 2. *Policy Arguments*

The Creditors also raise two unpersuasive arguments based on policy concerns. First, they assert that forbidding restitution here, even if it might result in injustice, would advance "finality." But, as the majority correctly points out, the Court of Appeals in *Banque Worms* did not express any interest in ensuring that transactions are "final," in the sense that they cannot be undone, in all cases. To the

---

[20] The Creditors claim to find support in the *Third Restatement*, which allows for retention of funds even where a creditor has "something short of an enforceable right." Restatement (Third) of Restitution § 67 cmt. c. The Creditors overread this language. *See id.* § 67 cmt. h ("The object of the rule of § 67 is not the 'finality' of payment transactions without more . . . but the security of expectations of ostensible ownership— expectations that are reasonably formed on receipt of money *to which the payee is apparently entitled*." (emphasis added)). In any event, the Court of Appeals explicitly adopted the rule of the *First Restatement*, the *Third* was published twenty years after *Banque Worms*, and the latest edition forthrightly admits that it seeks to "state[] the rule more broadly" than the *First Restatement* to cover "a wide range of transactions." *Id.* § 67 cmt. a; *see also Kansas v. Nebraska*, 574 U.S. 445, 475 (2015) (Scalia, *J.*, dissenting) (noting that "modern Restatements—such as the Restatement (Third) of Restitution . . .—are of questionable value, and must be used with caution" given the authors' increasing "abandon[ment] [of] the mission of describing the law" and their "cho[ice] instead to set forth their aspirations for what the law ought to be").

contrary, it held that "[w]hen a beneficiary receives money *to which it is entitled* and has no knowledge that the money was erroneously wired . . . such a beneficiary should be able to consider the transfer of funds *as a final and complete transaction*, not subject to revocation." *Banque Worms*, 570 N.E. at 196 (emphasis added). This holding echoes traditional equitable and commercial concerns, not a rule of "finders, keepers." If the court wanted to insist on the finality of all errant transactions, it would have had to do away altogether with the law of unjust enrichment, which provides for the unwinding of otherwise-final transfers. *See* Andrew Kull, *Rationalizing Restitution*, 83 Calif. L. Rev. 1191, 1234 (1995). An erroneous transfer by itself creates no new "final" entitlement: Discharge for value lets a creditor keep mistakenly transferred funds if it was already entitled to those funds, but it does not convert a mistake into a sudden acceleration of maturity.

Second, drawing on the reasoning of the district court, the Creditors suggest that, by penalizing transferors for their mistakes, courts might encourage them to take greater care. But to what end, and at what cost? If a transferor discovers its mistake and asks for its money back before the transferee has either relied on or given value for it, then there is no harm done—not to the transferee, and not to anyone else. All that remains is the transferor's own, internalized cost of pursuing recovery, a cost that supplies the efficient deterrent.[21]

---

[21] *See* J. Beatson & W. Bishop, *Mistaken Payments in the Law of Restitution*, 36 U. Toronto L.J. 149, 150 (1986) (Where a "mistaken payment is very quickly discovered . . . [a]ny such avoidance expenditure would be wasted—a costly attempt to avoid a costless event."); Dhammika Dharmapala & Nuno Garoupa, *The Law of Restitution for Mistaken Payments:*

The law thus allows mistaken transferors to recover even if they were negligent.   *Ball*, 95 N.E. at 721.

And even if we were permitted to modify the discharge-for-value rule to achieve the policy ambitions articulated by the district court, it would be bizarre to do so here.   In particular, the district court's warning that "the banking industry could—and would be wise to—eliminate the risk [of mistakes] altogether" is especially inapt in the context of what it called a "Black Swan" event. [22] *Citibank*, 520 F. Supp. 3d at 451.   Denying recovery would senselessly induce loan agents to expend resources in a futile effort to prevent *all* possible mistakes, no matter how unpredictable, and no matter how

*An Economic Analysis* (manuscript at 30) (Feb. 2022), https://ssrn.com/abstract=3902607 ("[I]t is clear . . . that [full restitution] is socially optimal whenever harm is unilateral—i.e., when a mistaken payment imposes [harm] only on the payer (absent restitution)."); Maytal Gilboa & Yotam Kaplan, *The Cost of Mistakes*, 122 Colum. L. Rev. F. 61, 67 (2022) ("[A]s long as the mistake is harmless, restitution should be available to protect the payer."); Peter K. Huber, *Mistaken Transfers and Profitable Infringement on Property Rights: An Economic Analysis*, 49 La. L. Rev. 71, 83 (1988) ("[A]s long as the recipient has not disposed of the money, he generally suffers no loss if he has to turn it over to the transferor-claimant.").

[22] Indeed, the entire point of the "Black Swan" framework that the district court invoked is that predicting extreme events is an impossible, counterproductive task.   *See* Nassim Nicholas Taleb, *The Black Swan: The Impact of the Highly Improbable* 208 (2d ed. 2010) ("[D]o not try to predict precise Black Swans . . . . Remember that infinite vigilance is just not possible.").   Instead, the theory goes, systems should be "robust" in that they can flexibly respond to errors when they inevitably occur.   *Id.* at 322. For example, perhaps rather than imposing on banks a duty to prevent all possible errors, the law might allow them to recover mistakenly transferred funds when a transferee has neither relied on nor given value for them.

harmless. It should come as no surprise that the opinion below has roiled the market for commercial debt, to the point where the type of contract clause overriding the district court's rule already has its own name: "Revlon blocker." *See* Brief of Professors of Law and Economics as Amici Curiae at 27; Eric Talley, *Discharging the Discharge-for-Value Defense*, 18 N.Y.U. J.L. & Bus. 147, 154 (2021) (reporting a "veritable flood" of 150–200 such Revlon blockers *per month* following the decision, compared to exactly one contract affirmatively adopting the district court's rule).

### III. CONCLUSION

Although the Court has ultimately arrived at the correct conclusion, our timing is unfortunate. Citibank filed suit within six days of its mistake, the district court conducted a full bench trial and published a detailed opinion six months later, and we set out to expedite consideration of this case. But it has now been nearly a year since oral argument and over two years since the mistaken transfer.[23] In that time, Citibank has lost out on tens of millions of dollars in returns on its frozen funds. Businesses and their lenders have scrambled to negotiate various new terms into their agreements. *See* Talley, *supra*, at 199–200. And the parties, as well as the market at

---

[23] At oral argument, it was suggested that we might be amenable to certifying questions to the New York Court of Appeals. Thankfully, no one defends that path—and the months or years of additional litigation it could entail—today. In fact, even the party that floated the possibility of certification has since written to the Court that, in light of intervening events, *see infra* at 29–30, the parties would instead "benefit from a prompt resolution of this appeal." Appellant's Rule 28(j) Letter at 1 (June 22, 2022).

large, have had to manage the uncertainty our indecision has caused them.

This delay has had dire repercussions for Revlon, the company at the center of this case. Both sides contend that through subrogation, the district court's judgment has put Citibank in the shoes of the Creditors, obliging Revlon to pay Citibank instead and transferring to Citibank the credit risk of Revlon's distressed debt. A company like Revlon—no stranger to restructuring its debts—would normally try to negotiate with its creditors when struggling to meet its obligations. But Revlon never recognized Citibank's subrogation claim,[24] and even if it had, Citibank would have been at best a substitute creditor, whose claim (if any) would revert to Defendants once Citibank finally reclaimed its funds. Revlon cannot secure additional senior financing without the consent of a majority of the 2016 Term Creditors, but for the past two years, no one has been able to agree on who would constitute such a majority. So Revlon "effectively has had, since August 11, 2020, no 2016 Term Loan[] counterparty with which it can negotiate," and on June 15, 2022, Revlon filed for Chapter 11 bankruptcy. Declaration of Robert M. Caruso, Chief Restructuring Officer at 7, *In re Revlon, Inc.*, No. 22-10760 (Bankr. S.D.N.Y. June 16, 2022), ECF No. 30. Revlon, a century-old American company, cited not just its business troubles, but also "significant and unprecedented difficulty in managing its capital structure out of court." *Id.* at 37. That difficulty, Revlon

---

[24] *See* Revlon, Inc., Quarterly Report (Form 10-Q), at 33 (May 4, 2022) ("Citi has also asserted subrogation rights, but, as yet, there has been no determination of those rights (if any) under the 2016 [Term Loan] and Revlon has not taken a position on this issue.").

said, stemmed from the fact that "the Second Circuit ha[d] not yet issued a decision" in this case. *Id.*

Respectfully, the correct conclusion in this case was clear from the start. At bottom, Defendants received a payment to which they were not entitled, for which they did not bargain, and on which they did not rely. Their only real asserted justification for keeping Citibank's money is "finality"—the fact that they have it. But that is not enough to claim ownership over someone else's property. Possession is not ten-tenths of the law.

I join only in the majority's judgment.